## Planters'-Farmers' Warehouse Company of Louisville v. Citizens' Bank of Falmouth

(Decided March 6, 1928.)

### Appeal from Pendleton Circuit Court.

1. Pleading.—Where bank, having lien on tobacco of partnership, which was sold for partnership by warehouse, brought action against partnership and warehouse for recovery of proceeds of tobacco, and, on obtaining default judgment against partnership, execution on which was returned nulla bona, filed supplemental petition seeking to be subrogated to lien of one of partners, and making warehouse party defendant and garnishee, held that, since cause of action existed in bank's favor in original action, pursuant to which court could have acquired jurisdiction, court properly acquired jurisdiction to determine matters set up in supplemental petition.

2. Partnership.—To discharge himself from liability to which a person may be subject as a partner, every partner has the right to have property of partnership applied in payment of debts and liabilities of the firm.

3. Estoppel.—Evidence held not to show such conduct and acceptance by partners in sale by warehouse of partnership tobacco as to estop partners and bank, which by garnishment became subrogated to rights of partners, from having proceeds of sale applied to payment of partnership debt.

4. Estoppel.—One alleging estoppel has burden of proof, and, generally, to support an estoppel, facts must be clear, precise, and unequivocal.

DAVID R. CASTLEMAN for appellant.

L. P. FRYER and WARNER E. SETTLE for appellee.

OPINION OF THE COURT BY JUDGE McCANDLESS— Affirming.

The Citizens' Bank of Falmouth sued J. I. Monroe and J. C. Browning in the Pendleton circuit court on a note for $8,494.10; they being residents of Pendleton county. It also joined the Planters'-Farmers' Warehouse Company of Louisville, Jefferson county, as a party defendant, and sought to recover from it $4,286.85, proceeds of certain tobacco sold by it for J. C. Browning, and converted to its use, and upon which tobacco plaintiff asserted a lien by virtue of a mortgage executed to it in June, 1920. The warehouse company was served with summons in Jefferson county.

It first raised a jurisdictional question, and by appropriate motions sought to quash the return on the sum-

mons; to require plaintiff to elect whether it would proceed against Browning and Monroe on contract or against it in tort; and, without waiving its objections to the jurisdiction of the court, filed answer traversing the affirmative allegations of the petition and pleading a number of affirmative defenses. Browning and Monroe made no defense, and default judgment was taken against them; execution issued on this judgment, and was returned "no property found." Thereupon the bank filed a supplemental petition based on the return of nulla bona, asserting that the funds above described were the proceeds of sale of tobacco owned by the firm of Browning & Monroe, upon which a partnership lien existed in favor of Monroe, and asking to be subrogated to his lien, and making the warehouse company a party defendant and garnishee. Summons issued on this pleading, and was served on the warehouse in Jefferson county. The warehouse company objected to this pleading, but this was overruled, and it excepted. Thereupon it filed answer both as defendant and as garnishee, reiterating and elaborating its original defenses contained in the answer. Much proof was taken, and the court handed down a written opinion upholding the position asserted by plaintiff in its supplemental petition, and judgment was entered in its favor in accordance with the prayer of its petition. The warehouse company appeals. Many interesting issues raised in the original petition may be eliminated if the view of the chancellor is upheld, but a consideration of either requires a statement of fact.

It appears that in the year 1920 Browning and Monroe were engaged as partners in the conduct of the Pendleton Tobacco Warehouse in the city of Falmouth, and also engaged in the purchase of tobacco on the loose-leaf floors. In this way they became indebted to the bank in the sum of $16,000. The bank was not authorized to extend that amount of credit to an individual or firm, and the amount was split between the two; Monroe executing his note to the bank for $7,000, and Browning executing a similar note for $9,000. To secure this indebtedness the firm executed, acknowledged, and delivered to the bank a mortgage on 200,000 pounds of tobacco then in Blades warehouse in Falmouth. This mortgage was not put to record until the 18th of April, 1923. At the end of the 1920 warehouse season Monroe and Browning reported this tobacco under governmental regulations as having been sold to J. C. Browning; their explanation

being that Monroe was not a regular registered dealer, but that Browning was such; that the transfer of the tobacco was made on their books for convenience in making monthly reports, but that in so doing he was holding the tobacco for the firm. Beginning with June of that year and at intervals of several months, portions of this tobacco was prized, shipped, and delivered to the Planters'-Farmers' Tobacco Warehouse Company in Louisville for storage and sale, the bank consenting thereto. This transaction began with a letter from J. C. Browning on his individual letterhead, dated June 26, 1920, reading:

"J. C. Browning, Leaf Tobacco Dealer.

"Falmouth, Kentucky, June 26, 1920.

"Planters'-Farmers' W. H. Co., Louisville, Ky.—Dear Sirs: Inclosed find B of L for car of tobacco shipped you today. I wish to order up for sale on Wednesday, June 30th Nos. as follows: No. 8. 14, 16, 11, 2, and 13 in order, these tobaccos were shipped several days ago, feel sure they are there.
"Yours very truly,          J. C. Browning."

Other letters of similar character followed. Defendants' witnesses say that all of the hogsheads shipped were marked "J. C. B.," and such is the weight of the evidence, though Monroe claims that it was marked "B & M." All sales were made in the name of J. C. Browning, and bills of sale and checks were made out in his name. The checks were mailed to and received by one of the firm, and, for the most part, were credited on the above-mentioned notes; the usual practice being to deposit the warehouse check in the bank and for the firm to give a check to that bank, except in a few instances where the checks for the sale were credited direct. This practice continued until the 20th of December, 1920, at which date all of the tobacco (154 hogsheads) had been received by the warehouse and 112 hogsheads sold. The remaining 42 hogsheads were held in storage until the 18th of April, 1923, at which time they were sold for $4,340. The warehouse company credited $——— of this on the indebtedness due it by Browning on another transaction, and tendered a check for the balance. As stated, supra, during the progress of the sales the firm had been reducing its indebtedness to the bank. In this way the individual note executed by Monroe had been

fully paid, and that of Browning materially reduced. The note sued on represents the balance then due on the note originally executed by Browning and is executed in the firm name, and by both Browning and Monroe.

The facts above stated are substantially established. There is a conflict of evidence, however, as to other matters. It appears that, shortly before the shipment of this tobacco began, Browning and J. S. Clark, under the firm name of J. S. Clark & Co., purchased a large quantity of tobacco then in storage in the Planters'-Farmers' warehouse, and that company advanced them the money paid therefor. This was sold during the year 1920, prior to December 20, leaving Browning and Clark indebted to the warehouse in the sum of $7,000.

Mr. Laban Phelps, manager of the warehouse, testifies that Browning was anxious for an extension of time on this indebtedness in order to give Clark an opportunity to make payments thereon. He (Phelps) had known Browning for many years, but had no notice or information as to any one else having an interest in or lien on the tobacco, and, considering Browning the sole owner, thought his factor's lien on the tobacco was ample security, and, by reason of this, granted an extension, and permitted them to execute a promissory note therefor, which extended the time of payment several months, and was later renewed. Clark did make a number of payments thereon, as did Browning. At the time Browning was amply solvent, and, had he known Monroe was claiming an interest in this tobacco, he could and would have collected the Clark-Browning debt from Browning, who is now hopelessly insolvent. Mr. Phelps states, as do other members of the firm, that he had not previously known Mr. Monroe, but that he did accompany Mr. Browning several times during the sales of this tobacco; that he was introduced to members of the firm, and perhaps, discussed the sales, but at no time was it intimated that he was personally interested therein. The first intimation that he had affecting Browning's title in any way was in December, 1922, when he was pressing him for a payment of the Clark note, and insisting on selling the tobacco for that purpose, and Mr. Browning said that the Citizens' Bank of Falmouth had purchased this tobacco, and that he told him that that would not affect the priority of his lien, and that Browning said no more about it.

About a week before the tobacco was sold, Mr. Monroe called up the warehouse, and ordered it up for sale, but it is not infrequent that this is done by a friend of the owner; that a sale was postponed, however, on account of the absence of Mr. Kirk, a prominent buyer, who had agreed to bid on the tobacco, and whom Mr. Browning wished to be present. It was later put up and sold, and Mr. Monroe was present on that occasion. He was offered a check over and above the amount of the indebtedness. At that time he signed a writing directed to the warehouse:

"Please hold account of sale and check 42 hogsheads of tobacco sold by J. C. Browning, April 18, 1923, as I claim one-half interest in this tobacco."

This was the first information that the warehouse had of his claim. Mr. Powers, president of the warehouse, was present at the December, 1922, conversation with Browning, and corroborates Mr. Phelps as to this, and further testifies to practically the same state of facts.

On the other hand, while admitting that all the transactions were handled in his name, Browning testifies that at the inception of the sales he introduced Mr. Monroe to the members of the warehouse firm as his partner, and Mr. Monroe is positive that he used the words "my partner in this tobacco." Both of them testify that Monroe was present at most of the sales, and that they, together with Mr. Phelps or Mr. Monroe, representing the warehouse company, at the close of each of such sales would confer as to the price received, and determine whether a rejection should be made. Browning further testifies that in December, 1922, when Phelps called to his attention the collection of his account, he informed him of the mortgage held by the Falmouth bank.

1. It is strongly urged that the court was without jurisdiction of the parties. The argument is that at the time suit was instituted the tobacco had been sold and the mortgage lien extinguished. That the mortgage lien did not attach to the proceeds of the tobacco, and, realizing that fact, plaintiff did not claim a lien, but sought a common-law judgment against Browning and Monroe in the county of their residence, and in the same case sued the warehouse, a resident of Jefferson county, in tort for conversion of the proceeds of the tobacco. That

these two actions were improperly joined, and the court therefore obtained no jurisdiction of the warehouse company by service of summons in Jefferson county.

2. That, as the warehouse company was not properly joined as a defendant in the original petition, and could not be sued singly in that action, the action was at an end when the judgment was entered against Browning and Monroe, and no further proceedings could properly be taken therein. On this assumption it is next argued that the amended and supplemental petitions were unauthorized, and could not have been grafted on the original action, and that therefore the court was without jurisdiction to consider or determine the issues raised therein.

On the other hand, the appellees insist that the jurisdiction was properly created in the first instance, and that the supplemental petition was not a departure from the original cause of action, and that the court properly acquired jurisdiction of the warehouse in the amended petition.

Considering these questions; inasmuch as the lower court based its decisions upon the garnishment proceedings set up in the supplemental proceedings, if jurisdiction was then rightfully acquired, it is unnecessary to determine whether the warehouse was properly joined at the inception of the action. It will be observed that in the original petition the bank sought to recover the proceeds of the tobacco from the warehouse on the theory that it had a lien thereon by virtue of the mortgage executed by the partnership. In the supplemental petition it claimed that a lien existed on the proceeds of the tobacco in favor of the individual partners, and sought to be subrogated to Monroe's interest therein by virtue of its attachment lien. If this cause of action existed at all, it existed at the time the first action was brought, and, if it had been set up at that time, the court would at least have acquired jurisdiction of this branch of the case by the service of summons upon the garnishee in Jefferson county, regardless of the claim under the mortgage. This would have required an affidavit and the execution of an attachment bond. The latter requirements were obviated by the return of nulla bona, but otherwise the cause of action was the same, and the fact that it was set up in a supplemental petition rather than in an independent action does not affect the status of the parties, as this case does not fall within the line of cases holding

that, where there is a lack of jurisdiction on the original petition, such jurisdiction cannot be acquired by filing an amended pleading therein upon a cause of action that did not exist at the time the original action was filed. See opinion in Lilly v. O'Brien, 224 Ky. 474, 3 S. W. (2d) —, in which this matter is fully discussed. It follows that the court properly acquired jurisdiction to determine the matter set up in the supplemental petition.

3. Considering the case on its merits, it is established that the partnership of Browning & Monroe owned the 154 hogsheads of tobacco, and that the bank's debt is owing by that firm. The partnership has not been settled, and it is heavily in debt. Browning is admittedly insolvent, and Monroe is bound for the firm debt. His equity is thus stated in 2 Lindley on Partnership, sec. 352, p. 597:

> "In order to discharge himself from liabilities to which a person may be subject as partner, every partner has the right to have the property of the partnership applied in payment of the debts and liabilities of the firm."

And in Power Grocery Co. v. Hinton & Alexander, 187 Ky. 171, 218 S. W. 1013, the principal was thus stated by this court:

> "The general principle is, that a member of a partnership, has an equity, which he is entitled to enforce, and which a firm creditor may enforce by a kind of subrogation to the equity of the partner and which entitles him to require the partnership liabilities to be paid out of the firm assets, unless the partner waives the right, before the interest of a partner in the firm, can be applied to the payment of his individual creditors."

Obviously, the bank was pursuing the proper remedy, but as its lien was acquired through and by virtue of the rights and equities of Monroe and Browning, in a sense it stands in their shoes. As to this we have said:

> "Being derivative merely, this lien (of the creditor) fails whenever the partner has done any act by which he has divested himself of the lien, the benefit of which is claimed by the creditor."

It follows that Browning and Monroe were entitled to have the fund in controversy applied to the payment of the partnership debt, and that the bank by its garnishment proceedings was subrogated to that right, unless Browning and Monroe were estopped from asking for such relief by their former conduct and acquiescence, and the case turns on the question of estoppel. If the warehouse company believed that Browning was the sole owner of the tobacco, and, without notice of the partnership, and relying on its factor's lien, granted indulgence to Browning, both Browning and Monroe would be estopped from asserting the partnership lien to the prejudice of the warehouse. On this point the evidence is conflicting. As stated, supra, all of the transactions with the warehouse were in Browning's name, and its witnesses are positive in denying notice of Monroe's claim, and unquestionably Browning was granted indulgence on his former indebtedness, and is now insolvent.

On the other hand, it is shown that the warehouse officials regarded Browning highly; that, prior to this transaction, they had advanced him $40,000 on the Clark-Browning tobacco, and he seemed to have their full confidence in every way. Also Monroe is positive that Browning introduced him to the warehouse firm as "his partner in this tobacco," and Browning, while not positive as "to this tobacco," is certain that he informed them that Monroe was his partner. They further testify that together with the warehouse officials they jointly passed on the propriety of accepting or rejecting sales in which Monroe took part. If these statements are true, the warehouse had notice of the partnership, and, notwithstanding the statements of Phelps and Powers to the contrary, the warehouse might have granted the extension to Browning, regardless of the ownership of the 42 hogsheads of tobacco stored in the warehouse. On this question, the warehouse had the burden of proof, and it is generally held that to support an estoppel the facts must be clear, precise, and unequivocal. 10 R. C. L. 845, and footnotes cited. The chancellor was acquainted with Browning and Monroe at least. In an elaborate opinion in which he cited all of the evidence, he held that an estoppel was not established, and, in view of the conflict of evidence, we are not prepared to say that his judgment was unauthorized.

Wherefore, perceiving no error, the judgment is affirmed.